UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

PENN ENGINEERING & MANUFACTURING
CORP and HEYCO PRODUCTS CORP,

          Plaintiffs,

   v.

Case No. 25-cv-0467-bhl

THOMAS MARSDEN and HELLERMANNTYTON
CORP,

          Defendants.

**ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

    Plaintiffs Penn Engineering & Manufacturing Corp. and Heyco Products Corp. allege that Defendant Thomas Marsden, a former Heyco employee, stole their confidential trade secrets as he was leaving Heyco's employment and then improperly shared them with his new employer, Defendant HellermannTyton Corp. Plaintiffs seek entry of a preliminary injunction (1) barring Defendants from using, possessing, or disclosing the alleged trade secrets and (2) ordering them to return or delete any trade secrets still in their possession. (ECF No. 65 at 2.) The Court ordered expedited discovery and then heard evidence at a two-day hearing on July 16 and 17, 2025. (ECF Nos. 51–52.) At the hearing's conclusion, the Court granted the parties' request to file post-hearing briefs. Based on the briefing, the evidence presented, and the relevant law, the Court will deny Plaintiffs' request for preliminary injunctive relief. Plaintiffs have established a likelihood of success on only one of their claims and, even with respect to that claim, have not shown that injunctive relief is necessary to prevent irreparable harm.

**FINDINGS OF FACT**

    Penn Engineering is a Delaware corporation headquartered in Danboro, Pennsylvania. (ECF No. 4 ¶6.) Heyco is a subsidiary of Penn Engineering. (*Id*. ¶7.) Plaintiffs design and manufacture mechanically attached fasteners, installation equipment, and component solutions across several markets, including automotive, consumer electronics, datacom and telecom, electric vehicles, and industrial product applications. (*Id*. ¶12.) Heyco's business is focused on wire

management, including bushings and plugs, cable wire management, conduits, fittings, and wire ties. (Hr'g Tr. at 70:24–71:4.)

HellermannTyton manufactures plastics, such as nylons, for various markets, including the solar market. (ECF No. 4 ¶14.) Within the solar market, HellermannTyton's business model focuses on utility scale projects (large solar farms providing energy for large utility companies.) (ECF No. 63 ¶8.) Heyco maintains that HellermannTyton is a competitor in the wire management and solar segments of its business. (*See* Hr'g Tr. at 72:11–22.) HellermannTyton agrees that it and Heyco have overlapping customers but disputes the level to which they are significant competitors. (*See id.* at 238:15–22.)

Marsden is a former Heyco employee, who left Heyco to accept a position at HellermannTyton in early 2025. (*Id.* at 139:18–140:1.) Marsden worked at Heyco for over nine years, ultimately serving as Director of Product Marketing and Renewable Energies. (*Id*. at 140:2–7.) In that position, Marsden lead and directed the Sales Organization, sold Heyco products to the Renewable Energy/Solar and other focus markets, and managed and developed all geographic areas for the foregoing markets and specific sales channels. (ECF No. 7 ¶8.) Marsden worked on product development with the engineering team and product manager, managed the renewable energy sales team, supported that team's targeting of new accounts, and pursued leads for Heyco's solar business, including coordinating meetings with customers. (Hr'g Tr. at 73:5–11, 140: 8–18.)

As part of his employment with Heyco, Marsden signed an Intellectual Property Assignment & Confidentiality Agreement ("Confidentiality Agreement"). (ECF No. 21-1.) Paragraph 4 of the Confidentiality Agreement required him to return any Heyco property, including information and documents stored in his computer, when his employment ended. (*Id.* ¶4.) The Confidentiality Agreement does not include any non-compete or non-solicitation provisions. Nor did Marsden sign any other agreements providing for such obligations. (Hr'g Tr. 45:2–7, 140:22–141:2.)

On January 17, 2025, Morgan Sullivan, a HellermannTyton recruiter, contacted Marsden concerning an opening for a "Market Development Manager – Renewables" position at the company. (*Id.* at 209:4–211:6.) From his LinkedIn profile, Sullivan knew that Marsden worked for Heyco but was unaware that Heyco was a HellermannTyton competitor. (*Id*. at 210:6–11.) After initial email contacts, Sullivan conducted a telephonic screening interview of Marsden on January 31, 2025. (*Id.* at 212:6–25.) Marsden was later interviewed by Vice President of

Marketing Ronald Kovac and two other executives. (*Id.* at 213:18–21.) During his interview with Kovac, Marsden discussed his role at Heyco and the job duties of the HellermannTyton position. (*Id.* at 242:18–43:22.) Kovac asked whether Marsden had a noncompete, and Marsden responded that he did not believe so but would need to check to make sure. (*Id.* at 243:23–244:20.)

On February 12, 2025, Sullivan informed Marsden that HellermannTyton planned to extend him an offer and again confirmed that he was not subject to a noncompete. (ECF No. 64 ¶¶116–17.) Later that day, she formally offered him the position. (*Id.* ¶118.) Over the next several days, Marsden and HellermannTyton representatives negotiated the terms of his offer. (*Id.* ¶¶121–23.) On Sunday, February 16, 2025, HellermannTyton arranged for the company's president, Terry Tuttle, to have coffee with Marsden to discuss him joining the company. (*Id.* ¶¶124–25.) On Monday, February 17, 2025, Marsden formally accepted and signed the offer of employment. (*Id.* ¶126.)

The next day, Tuesday, February 18, 2025, Marsden informed his Heyco supervisor, Larry Kucera, that he had accepted an offer with a Heyco competitor, although he did not mention HellermannTyton by name. (Hr'g Tr. at 73:21–25.) Marsden told Kucera that he was willing to remain in his job with Heyco for another two weeks to allow for a transition, but Heyco terminated his employment later that day. (*Id.* at 74:3–75:12.)

Following Marsden's departure, Penn Engineering and Heyco reviewed the history of his computer usage. (*Id.* at 57:13–25.) The investigation revealed that, in the weeks before his departure, Marsden had forwarded company information to his personal email account. Plaintiffs confirmed that:

- On February 4, 2025, Marsden had exported a file containing various sales leads from Heyco's system. (ECF No. 64 ¶¶138–140; ECF No. 63 ¶30.)

- On February 14, 2025, Marsden similarly exported various Sharepoint files that detailed project information and opportunities. (ECF No. 64 ¶¶211–212, 215–16, 220–21, 224–25, 227–29.)

- On February 15, 2025, and February 17, 2025, Marsden exported additional Sharepoint files from Heyco. (*Id.* ¶¶232–33, 236–37, 277–78.)

- On February 17, 2025, Marsden forwarded documents from his Heyco email account to his personal account relating to a Heyco financial acumen training he had attended over a year earlier. (*Id.* ¶¶189–90.)

- On the morning of February 18, 2025, Marsden forwarded to his personal email address an email requesting samples from a potential solar customer or lead. (*Id.* ¶196.)

On February 26, 2025, Dennis Shea, Penn Engineering's Chief Legal Officer, emailed Marsden, confronted him with the results of Plaintiffs' investigation, and accused him of misappropriating Heyco's trade secret and confidential information. (Hr'g Ex. 1004 at 1.) Shea asserted that Marsden "obviously" took the materials for use at HellermannTyton and directed him to preserve the materials he took along with any communications with his new employer. (*Id.*) Shea also instructed Marsden not to use copy or disseminate Heyco's information and warned that his "level of cooperation" would affect how Penn Engineering/Heyco moved forward. (*Id.*)

After receiving Shea's missive, Marsden responded with his own email, acknowledging sending himself files while at Heyco but assuring Shea that the documents were not used for any improper purposes. (*Id.* at 5.) Marsden explained he had forwarded files to update Heyco's "lead maps" as part of his regular job duties. (*Id.*) He further assured Shea that he had since deleted all information he had taken and attached a video showing him deleting the files, including his Outlook Contacts database. (*Id.*) Marsden asked if he needed to do anything else to fix the situation, noting that he had already returned his laptop and cell phone to Heyco. (*Id.* at 6.)

Shea did not accept Marsden's explanation. Instead, he sent a further email, expressing frustration that Marsden deleted the information (contrary to Shea's instruction) and "rejecting" his explanation for forwarding the identified files. (*Id.* at 5.) Marsden later flatly denied sharing any Heyco information with HellermannTyton and promised he had no intention of doing so. (*Id.* at 4.) He also apologized for deleting the files, explaining that he misunderstood Shea's request and acted based on a "gut reaction." (*Id.*)

Marsden provided Shea's email to Kovac, his new boss at HellermannTyton on February 26, 2025. (ECF No. 63 ¶81.) He acknowledged his Confidentiality Agreement with Heyco but explained that he had never intended to share Heyco's confidential information or trade secrets with HellermannTyton. (*Id.* ¶¶81–82.) Kovac responded by instructing Marsden not to share Heyco's confidential information with anyone at HellermannTyton and emphasizing that the company did not want Heyco's information. (*Id.* ¶84.)

Marsden began his employment with HellermannTyton on March 5, 2025. (ECF No. 64 ¶127.) On Marsden's first day, Kovac again expressly forbade him from using or disclosing any information Marsden obtained from Heyco. (ECF No. 63 ¶88.)

HellermannTyton then conducted its own internal investigation into whether it received any of Heyco's confidential or trade secrets from Marsden. (*Id.* ¶¶92–93.) The investigation turned up no shared information. (*Id.*) The company also retained an independent, professional forensic analysis firm to conduct a forensic analysis of Marsden's HellermannTyton-issued laptop. (*Id.* ¶95.) The analysis found no indication that Heyco's information was downloaded from or forwarded by Marsden's personal Gmail account. (*Id.* ¶96.) The review further confirmed that no Heyco confidential information had been accessed or transferred from any flash drive connected to Marsden's HellermannTyton computer. (*Id.* ¶¶96–102.) HellermannTyton affirmatively instructed its employees to report to their managers if they discovered any confidential information or trade secrets belonging to Heyco. (*Id.* ¶104.)

On March 11, 2025, HellermannTyton informed Heyco of the results of its internal investigation. (*Id.* ¶94.) It also assured Heyco that it had instructed Marsden not to use, share, or disclose any of Heyco's confidential information with HellermannTyton. (*Id.*)

Marsden insists he no longer has any Heyco information in his possession and that he never shared any of the information he formerly possessed with anyone at HellermannTyton. Marsen testified that he accessed and exported Heyco information prior to his departure in connection with performing his Heyco job responsibilities. Consistent with his email to Shea, Marsden explains that he forwarded information to his personal email to create "lead maps" as part of his Hecyo duties. (Hr'g Tr. at 141:18–25.) Because Heyco did not have a system to create these maps, Marsden created them through Google maps. (*Id.*) The process was complicated by Heyco's computer security protocols, which prevented Marsden from updating the maps with his Heyco-issued computer. (*Id.* at 142:2–6.) Accordingly, for at least two years, he updated the lead map on his personal computer and then sent a link that he could share with Heyco's regional managers from his Heyco computer. (*Id.* at 199:13–18.) Marsden acknowledges that this practice violated Heyco's IT security policy, but he explains that he adopted a workaround to avoid the IT security protocols as other members of Heyco's sales group did in similar situations. (*Id.* at 142:2–10.) He believes his supervisor, Kucera, was aware of the practice. (*Id.* at 142:14–22.) Kucera did not

recall being aware of the practice or of Marsden asking for permission to make lead maps in this way. (*Id.* at 73:15–20.)

Marsden testified that he exported files and made changes to update the lead map on February 4, 2025, and then sent the update to regional managers and himself. (*Id.* at 143:4–19; 159:23 –160:7.) He offered similar explanations for the February 14, 15, 17 & 18 downloads. Marsden also testified that other Heyco job responsibilities required him to export and access the information on the identified days, although he does not remember the specifics of each task. (ECF No. 64 ¶¶213–14, 217–18, 222–23, 226, 230–31, 234, 238–39, 242–43, 249–50, 253–54, 257–58, 261–62, 265–67, 270–71, 274–76.) He also explained that he was scheduled to attend an industry trade show called Intersolar in late February on Heyco's behalf and likely accessed information in preparation for attending. (*Id.* ¶222.) He testified that he was authorized to access every file he emailed and exported between February 14 through the 18. (ECF Nos. 63 ¶129; 64 ¶¶201, 204.)

## ANALYSIS

Plaintiffs ask the Court to enter a preliminary injunction: (1) barring Marsden and HellermannTyton "from, directly or indirectly, using, possessing, disclosing, or otherwise misappropriating Plaintiffs' confidential information or trade secrets;" and (2) requiring Marsden and HellermannTyton "to return to [Plaintiffs] all originals and any copies of all files and documents that contain or relate to Plaintiffs' confidential information or trade secrets including, as necessary, through electronic deletion by a third party." (ECF No. 65 at 2.)

Plaintiffs bear a significant burden in obtaining this relief. "A preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021) (internal quotation marks and citations omitted); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right." (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). To obtain injunctive relief, Plaintiffs must show: (1) they are likely to succeed on the merits of their claims; (2) they will suffer irreparable harm in the absence of relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20.

Plaintiffs have not carried their burden. Despite being allowed expedited discovery, Plaintiffs have offered no evidence that Hellerman Tyton acted improperly in connection with Marsden's hiring or in its response to learning of Heyco's concerns about Marsden's handling of

its confidential information. And while the record confirms that Marsden likely violated both Heyco internal policy and the terms of his Confidentiality Agreement in his handling of Heyco's information, Plaintiffs have not shown that injunctive relief is needed to protect them from further injury. To the contrary, Marsden has sworn that he has returned or deleted any confidential information that he took with him when he left Heyco's employment. At this point, there is no reason to suppose that either Marsden or HellermannTyton still have any Heyco information. Plaintiffs' speculation of potential future harm does not suffice to support ongoing injunctive relief. Accordingly, Plaintiffs' motion will be denied.

I. **Plaintiffs Have Only Shown a Likelihood of Success on Their Breach of Contract Claim Against Marsden.**

Plaintiffs' complaint and their motion for injunctive relief are based on three substantive legal theories. First, they assert two counts for breach of contract against Marsden based on his alleged violations of the Confidentiality Agreement. (ECF No. 1 ¶¶45–66.) Second, Plaintiffs contend that HellermannTyton tortiously interfered with Heyco's Confidentiality Agreement with Marsden. (*Id.* ¶¶67–72.) Third, Plaintiffs allege that both Marsden and HellermannTyton misappropriated Heyco's trade secrets in violation of both federal and state law. (*Id.* ¶¶73–101.) Plaintiffs have only established a likelihood of success on their breach of contract claim.[1]

A. **The Evidence Does Not Support a Finding that Either Defendant Misappropriated Plaintiffs' Trade Secrets.**

Plaintiffs claim that Marsden and HellermannTyton misappropriated their trade secrets in violation of the Defend Trade Secrets Act (DTSA), 18 U.S.C. §§1831–1839, the Wisconsin Uniform Trade Secrets Act (WUTSA), Wis. Stat. §134.90, and the Pennsylvania Uniform Trade Secrets Act (PUTSA), 12 Pa. Cons. Stat. §§5301–5308. (ECF No. 4 ¶¶72–100.) All three statutes prohibit misappropriation of trade secrets, and courts employ the same legal analysis under all three pieces of legislation. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 2d 558, 573 (N.D. Ill. 2019) (collecting cases recognizing that the WUTSA and DTSA are interpreted identically); *see also Teva Pharms. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 675 (E.D. Pa. 2018) (explaining that although the PUTSA and DTSA "use different wording," the two "essentially

---

[1] Plaintiffs also assert a claim against Marsden for breach of fiduciary duty, (ECF No. 1 ¶¶102–07), but in their briefing acknowledge that this claim "mirrors" their breach of contract and misappropriation claims. (ECF No. 65 at 6, n.1.) Plaintiffs relegate this claim to a single footnote in their brief, and have thus waived any argument for injunctive relief based on this cause of action. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012).

protect the same type of information"); *Schabacker v. Ferens*, 2024 WL 710632, at *8 (E.D. Pa. Feb. 21, 2024) (analyzing a DTSA and PUTSA claim in the same manner).

To prevail on their trade secret claims, Plaintiffs must show both that the information they possessed constituted a trade secret and that the trade secret was misappropriated. *See Kuryakyn Holdings, LLC v. Ciro, LLC*, 242 F. Supp. 3d 789, 798 (W.D. Wis. 2017); *Minuteman, Inc. v. Alexander*, 434 N.W.2d 773, 777–78 (Wis. 1989). The relevant terms are defined essentially the same under all three statutes, and for purposes of its analysis, the Court will focus on the DTSA definitions. Under the DTSA, trade secrets include any information that "the owner thereof has taken reasonable measures to keep . . . secret", and which "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]" 18 U.S.C. §1893(3).[2] The DTSA defines "misappropriation" as including "acquisition or use of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means[.]" 18 U.S.C. §1839(5)(A). Improper means "includes theft, bribery, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means[.]" *Id.* §1839(6)(A). But improper means specifically does not include acquisition by any "lawful means[.]" *Id.* §1839(6)(B). The DTSA also makes clear that unauthorized disclosure of another's trade secret is also misappropriation. *Id.* §1839(5)(B).

Plaintiffs contend they are likely to succeed on their trade secrets claim against Marsden because the evidence shows that he obtained Heyco's trade secrets by "improper means." (ECF No. 65 at 22.) Plaintiffs argue that the suspicious timing of Marsden's transfer of the files, (*id.* at 23), coupled with his deletion of the files against Shea's instructions, (*id.* at 24–25), are sufficient to show that Marsden misappropriated Heyco's trade secrets. In support of this argument, Plaintiffs cite two federal court cases from Illinois: *In re Adegoke*, 632 B.R. 154 (Bankr. N.D. Ill. 2021) and *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859 (N.D. Ill. 2001).

*Adegoke* is a bankruptcy case in which the court concluded that the debtor misappropriated trade secrets from his former employer. 632 B.R. at 171. The evidence confirmed that the debtor

---

[2] While the Court is skeptical that some of the information at issue qualifies for trade secret protections, for the purposes of this motion, the Court will assume that the information taken may constitute trade secrets under the DTSA, PUTSA and WUTSA.

had accessed hundreds of his employer's confidential files, none of which related to his role, in the early morning hours (between 1:00 a.m. and 2:00 a.m.), immediately after interviewing with a competitor. *Id.* at 168. He similarly downloaded confidential files unrelated to his job on the night before another interview and again the day before he interviewed with the competitor's leadership team. *Id.* He also destroyed all meta data that could be used to ascertain what he did with the hundreds of files, and, when his employer confronted him over the downloaded files, he deleted them and claimed he could not access them. *Id.* In concluding that the debtor had misappropriated his former employer's trade secrets by obtaining the files by improper means, the bankruptcy court highlighted the suspicious timing of the downloads. *Id.* The bankruptcy court also found that the debtor's attempts to explain his actions—arguing, without any supporting evidence, that an unspecified person may have accessed the files using his credentials, and that the information was later deleted through an automated company wide data scrub—were not credible. *Id.* at 168–69. The court identified multiple inconsistencies in his testimony and concluded that his deletion of the files and metadata constituted spoliation. *Id.* at 169.

In *Grimes*, the defendant employee accessed his prior employer's computers using his home computer after business hours and later shared the information he took with other employees at his new workplace. 177 F. Supp. 2d at 868–69, 875. He ignored multiple cease and desist letters and communications from his former employer's counsel. *Id.* at 869. After litigation commenced, the defendant and his new employer deleted the information from his computer, and the employer's computers, despite being ordered by the court to preserve it. *Id.* The same day that the district court ordered the inspection of the defendants' computers, the employee defragmented his home computer. *Id.* at 869–70. Defragmentation can be used to "cover up deletions of data[.]" *Id.* at 870. The defendant in *Grimes* declined to testify to explain his actions or rebut prior statements he made, and did not call any other witness to explain his actions. *Id.* at 863, 875. There was no explanation put forth at all. *Id.* at 875. The district court therefore concluded that both the improper acquisition of trade secrets and the disclosure to other employees independently constituted misappropriation. *Id.*; *see also* 18 U.S.C. §1839(5)(B).

Based on the record before this Court, Plaintiffs have not established a likelihood of success on their trade secret misappropriation claims against Marsden. *Adegoke* and *Grimes* do not support Plaintiffs' claims here; the facts in those cases are very different. Like the defendants in *Adegoke* and *Grimes*, Marsen is a former employee who accessed information belonging to his former

employer. And, Marsden's conduct here, like the defendants in the other cases, raised understandable red flags for his former employer. But that is where the similarities end. Unlike the defendants in *Adegoke* and *Grimes*, Marsden has provided consistent, credible explanations for his actions. He testified that he forwarded or downloaded Heyco information as part of performing his job duties at Heyco, at a time he was authorized to do so. (ECF No. 63 ¶¶19–38; Hr'g Tr. at 141:18–143:19.) He further described in detail how he was responsible for updating Heyco's lead maps, his need to use Google Maps to update the maps, and how Heyco's IT policies required him to email the files to himself on his personal devices, before emailing them back to his Heyco laptop for distribution to his team. (ECF No. 63 ¶¶24–30; Hr'g Tr. at 141:18–142:6.) While the timing looks suspicious at first blush, Marsden's explanations largely rebut concerns about Plaintiffs' information being taken for ill purposes. And, unlike the defendants in *Adegoke* and *Grimes*, Marsden's explanation has remained consistent from his first email communication response to Shea through his hearing testimony.

The Court does not fault Plaintiffs for being concerned when they learned that Marsden had accessed, forwarded, and downloaded Heyco materials in the days and weeks immediately before his departure for HellermannTyton. But they have not come forward with evidence that Marsden took this information improperly, rather than merely doing his job at Heyco, as he testified. The Court allowed expedited discovery, but Plaintiffs offer no additional evidence that would give the Court reason not to believe Marsen's testimony. And to the contrary, Marsden's credibility is enhanced because there is no evidence that he transferred any Heyco information to anyone at HellermannTyton and has neither dodged Plaintiffs' communications nor behaved evasively during discovery, like the defendant in *Grimes*. In sum, Marsden has adequately explained his actions and Plaintiffs have not introduced evidence sufficient to bring his credibility into question.

Marsen's most problematic behavior was his failure to follow Shea's instruction to preserve and not delete any of the information he had forwarded or downloaded. But he explained (both contemporaneously and at the hearing) that he deleted the information on gut instinct and based on a misunderstanding of his legal obligations. (Hr'g Ex. 1004; H"g Tr. at 144:3–7.) The Court finds his explanation credible and concludes that Plaintiffs have not shown that they will likely succeed on their claim that Marsden misappropriated trade secrets.

Plaintiffs have even less likelihood of prevailing on their trade secret claim against HellermannTyton. Plaintiffs assume that HellermannTyton must have received or used the documents Marsden took, but they offer no evidence that this actually occurred. Instead, they simply assume it to be the case and argue that it is HellermannTyton's obligation to prove otherwise. (*See* ECF No. 65 at 24–25.) But it is Plaintiffs' burden of proof to support their claims and their request for injunctive relief. The actual, credible evidence does not support a finding that HellermannTyton misappropriated Heyco's trade secrets. All of HellermannTyton's witnesses, including Marsden, testified that none of the information Marsden accessed in his final days at Heyco found its way to his new employer. HellermannTyton conducted an internal investigation that found none of Plaintiffs' information on any HellermannTyton system. (ECF No. 63 ¶¶92–93.) And an independent forensic analysis of Marsden's HellermannTyton issued laptop and HellermannTyton's information systems also did not discover any of Plaintiffs' information. (*Id.* ¶¶94–98.)

The only specific pieces of evidence Plaintiffs offer are: (1) HellermannTyton's admission that its investigation showed Marsden had accessed his personal Gmail account while on his HellermannTyton device, despite being instructed not to do so; and (2) HellermannTyton's ordering of a Heyco product that Marsden had been involved in developing. (ECF No. 65 at 35.) Neither point alters the Court's analysis. Marsden's conduct in accessing his personal Gmail account on a HellermannTyton device does not establish that HellermannTyton received, let alone misappropriated, any trade secret information. At most, it shows that Marsden is not very good at following instructions. But any concerns arising from this conduct are not supported by evidence that Marsden's accessing of his Gmail account had anything to do with Plaintiffs' trade secrets. HellermannTyton's forensic analysis found no evidence suggesting transmission or access of Heyco information from his Gmail account onto his HellermannTyton laptop or into HellermannTyton's database. (ECF No. 63 ¶¶99–101.) The analysis did show that he accessed a publicly available webpage for a Heyco product, (*id.* ¶102), but that is far from evidence of any trade secret misappropriation. Similarly, the fact that someone at HellermannTyton ordered a Heyco "SunHanger" product after Marsden joined the company, (ECF No. 65 at 25; ECF No. 64 ¶¶382–383), does not support a finding in Plaintiffs' favor. The Court is not sure how this is relevant at all. Despite having the chance for expedited discovery, Plaintiffs have not come forward with any evidentiary thread tying this purchase to Marsden, to any Heyco information he

may have accessed before leaving the company, or to any communications he may have had with anyone at HellermannTyton about this product.

In the end, Plaintiffs offer little beyond their own speculation to support their trade secrets claims. But surmise is not evidence and does not support any finding of liability against HellermannTyton. Because Plaintiffs have not shown a likelihood that Defendants misappropriated their information, they are not entitled to a preliminary injunction in relation to their trade secrets claim.

### B. The Evidence Also Does Not Support a Finding that HellermannTyton Interfered with the Confidentiality Agreement Between Heyco and Marsden.

Plaintiffs' second legal theory is that HellermannTyton tortiously interfered with Heyco's contract with Marsden. (ECF No. 65 at 10.) In terms of the underlying breach, Plaintiffs allege that Marsden violated Paragraph 4 of his Confidentiality Agreement, a provision that required him to deliver to Heyco all documents or information that he had in relation to his employment at the end of his employment. (*Id.* at 5.)

To establish that Hellerman Tyton tortiously interfered with Plaintiffs' contract, they must establish five elements: (1) Plaintiffs had a contract with Marsden; (2) HellermannTyton interfered with the contract; (3) the interference was intentional; (4) a causal connection exists between the interference and damages; and (5) HellermannTyton was not justified or privileged to interfere. *See Briesmeister v. Lehner*, 720 N.W.2d 531, 542 (Wis. Ct. App. 2006). In determining whether interference was intentional, courts may consider the defendant's statements and actions and infer that a person intends the natural and probable consequences of their actions. *Id.* at 542–43 (citing Wisconsin JI—Civil 2780).

Plaintiffs argue HellermannTyton committed tortious interference by not specifically asking Marsden if he had a confidentiality agreement before hiring him[3], by not doing *more* than instructing Marsden not to use or access the documents he took from Heyco, by not conducting a sufficiently intensive forensic investigation, and by failing to monitor Marsden sufficiently. (ECF No. 65 at 10–11.) None of these arguments carry the day and Plaintiffs have not carried their burden on this claim either.

---

[3] The record establishes that HellermannTyton asked Marsden about any non-compete agreements, as well as other contractual obligations with Heyco, more generally. (*See* Hr'g Tr. at 216:5–12.)

Plaintiffs cite no authority for the proposition that any of HellermannTyton's conduct constitutes tortious interference with contract and it is far from clear that any of the actions identified, even if proved, would constitute tortious interference. As an initial matter, most of the identified conduct is alleged to have occurred *after* Marsden had already taken the information from Heyco in breach of the Confidentiality Agreement. (*Id.* at 9–10.) It is hard to conceive how subsequent conduct could have caused a prior breach and thereby interfered with Plaintiffs' Confidentiality Agreement with Marsden. The Court is unaware of any caselaw, and Plaintiffs have not cited any, that would allow a tortious interference claim based on conduct that occurred after the underlying breach of contract.

Moreover, there is no evidence that HellermannTyton encouraged Marsden to breach the Confidentiality Agreement. To the contrary, HellermannTyton asked (more than once) whether Marsden had a non-compete and he responded that he did not. (Hr'g Tr. at 216:5–12, 243:23–244:8.) And the evidence is undisputed that when HellermannTyton learned of Marsden's obligations under the Confidentiality Agreement—after he had been hired—it unequivocally instructed him to not share any confidential information and instructed its own employees to report any sharing that occurred. (ECF No. 63 ¶¶88, 104.) There is simply no evidence to suggest that HellermannTyton has interfered with Marsden's contractual obligations to Heyco. Plaintiffs have not established a likelihood of success on their tortious interference claims against HellermannTyton.

### C. The Evidence Supports a Finding that Marsden Breached the Confidentiality Agreement.

The sole legal claim on which Plaintiffs have a likelihood of succeeding on the merits is their breach of contract claim. With respect to a breach of contract, Plaintiffs must show that (1) a contract existed between them and Marsden; (2) Marsden breached that contract; and (3) Plaintiffs were damaged by the breach. *See Brew City Redevelopment Grp, LLC. v. The Ferchill Grp.*, 714 N.W.2d 582, 588 (Wis. Ct. App. 2006). The record establishes a high likelihood that Plaintiffs can show the first two elements.

In their complaint, Plaintiffs allege that Marsden breached paragraphs two and four of the Confidentiality Agreement. (ECF No. 1 ¶¶45–66.) But in their post-hearing briefing, Plaintiffs rely entirely on Marsden's alleged breach of paragraph four. (ECF No. 65 at 7.) Paragraph four required Marsden to return all documents and property belonging to Plaintiffs to Heyco at the end

of his employment. (ECF No. 64 ¶85.) It is undisputed that Marsden had a contract with Heyco and that he still had some Heyco information in his possession after he left the company. These facts establish the first two elements of Plaintiffs' claim with respect to the breach of paragraph four of the Confidentiality Agreement. But, as Defendants maintain, Plaintiffs' ability to show damages is less clear.

Plaintiffs only identify potential damages relate to their loss of the "exclusive use" of their confidential information and trade secrets. (ECF No. 65 at 9.) Plaintiffs have not come forward with evidence that any of the documents or information that Marsden took ever made it past himself and to HellermannTyton. Nor have Plaintiffs identified a single lost account or business opportunity caused by this breach, but instead assert it is simply too soon to tell. (*Id.*) Plaintiffs instead rely again upon speculation of potential damages. They argue that it is "plausible that Marsden did, in fact, retain copies of these files after his departure (not to mention, he could have otherwise recorded or captured, or even simply remembered, the data therein)." (*Id.* at 7.)

For present purposes, Plaintiffs' damages evidence is questionable. This is not to say that Plaintiffs might not be able to prove damages at trial, but for purposes of this preliminary injunction motion, the evidence of quantifiable damages is very weak. The Court will, however, give them the benefit of the doubt and assume, for the purposes of assessing whether to grant a preliminary injunction, that Plaintiffs have shown some likelihood of success on the merits of their breach of contract claim against Marsden. Because they have not satisfied the other requirements for obtaining injunctive relief, the resolution of this issue is immaterial.

II. **Plaintiffs Have Not Shown That They Face Irreparable Harm or Lack an Adequate Remedy at Law.**

Even assuming Plaintiffs have a likelihood of success on their breach of contract claims, they must also show that they will suffer irreparable harm in the absence of relief. *Winter*, 555 U.S. at 20. A party experiences irreparable harm when traditional legal remedies would be inadequate. *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021) (citing *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020)). To show that a traditional legal remedy is inadequate, Plaintiffs must show that the harm alleged cannot be redressed by a final judgment on the merits absent judicial intervention. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). If Plaintiffs make that showing, the Court must then assess "whether the balance of harms favors them or whether the harm to other parties or the public is sufficiently

weighty that the injunction should be denied." *Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1058 (7th Cir. 2016) (citing *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012)).

Plaintiffs make several irreparable harm arguments. (ECF No. 65 at 27–29.) First, they invoke a presumption of irreparable harm that they contend arises in cases involving the misappropriation of trade secrets. (*Id.* at 27.) This argument fails because the Seventh Circuit has rejected this presumption. *See Life Spine, Inc.*, 8 F.4th at 545 (noting that the district court erred because there is no longer a presumption of irreparable harm upon a showing of likely success on a misappropriation of trade secrets claim (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 393 (2006); *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012))).

Second, Plaintiffs rely upon contractual language in the Confidentiality Agreement in which Marsden agreed that Plaintiffs would suffer irreparable harm in the absence of injunctive relief. (ECF No. 65 at 28.) This argument fails because courts have long recognized that a judicial determination on the likelihood of irreparable harm is an indispensable requirement for granting injunctive relief. *Fireman's Ins. Co. of Newark, New Jersey v. Keating*, 753 F. Supp. 1146, 1154 (S.D.N.Y. 1990). Accordingly, parties cannot contract around the required showing of irreparable harm. *See Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987) ("[T]he contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate"); *First Health Grp. Corp. v. Nat'l Prescription Adm'rs, Inc.*, 155 F. Supp. 2d 194, 235 (M.D. Pa. 2001) (rejecting plaintiff's assertion that defendant had contracted around a judicial determination of irreparable harm); *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1074 n.14 (N.D. Ill. 2020) (collecting cases). Without independent proof of irreparable harm, this contract term does not carry the day.

Third, Plaintiffs argue that the mere *risk* of irreparable harm based on their loss of the exclusive use of their trade secret information suffices to support their request for an injunction. (ECF No. 65 at 28.) Plaintiffs cite language from the Third Circuit's decision in *Oakwood Laboratories LLC v. Thanoo,* 999 F.3d 892 (3d Cir. 2021), and the Supreme Court's decision in *Ruckelshaus v. Monsanto Corporation*, 467 U.S. 986 (1984), but neither decision supports a finding of irreparable harm here. *Oakwood* involved the reversal of a district court's dismissal of a complaint alleging trade secrets misappropriation. 999 F.3d at 896–97. In rejecting the district court's ruling, the court of appeals held that a trade secret plaintiff need not allege harm separate from the misappropriation. *Id.* at 913–14. While *Oakwood* explains what constitutes harm in the

context of pleading, it does not establish that misappropriation itself automatically warrants a presumption of irreparable harm for the purposes of granting a preliminary injunction. *See id.* at 914. *Ruckelshaus* is similarly inapplicable. Plaintiffs cite language in which the Supreme Court recognized that the right to exclude others from a trade secret is central to its value as property. (ECF No. 65 at 28–29 (citing *Ruckelshaus,* 467 U.S. at 1011).) This language has no bearing on the evidence needed to show irreparable harm in the preliminary injunction context.

While Plaintiffs repeatedly suggest there is a risk of harm based on a heretofore unknown disclosure of information by Marsden, the record confirms that HellermannTyton did not receive any of Heyco's information. As the Court has previously emphasized, Plaintiffs' theory remains too speculative to warrant granting injunctive relief; a finding of irreparable harm must be based in something more than a party's speculative fears of future harm. *See Insulet Corp. v. EOFlow, Co. Ltd.*, 104 F.4th 873, 883–84 (Fed. Cir. 2024).

Plaintiffs cannot save their evidentiary failings by arguing that the harm they face cannot be reasonably estimated. Plaintiffs bear the burden of proof on their preliminary injunction motion. *Winter*, 555 U.S. at 20. That burden is not obviated by the potential difficulty in proving their entitlement to relief. At this point, Plaintiffs offer only speculation that they may potentially face some unknown future harm. Speculation is not evidence. *Insulet Corp.*, 104 F.4th at 883. And, again, the evidence actually produced undercuts their claims. The credible evidence is that Marsden returned or deleted all confidential information that he took with him and that his new employer, HellermannTyton, never received any of that information. (ECF No. 63 ¶¶92–93.) At this point, there is no evidence to suggest HellermannTyton poses any risk of harm to Heyco because of Marsden's actions. Plaintiffs have not shown that they do not have an adequate remedy at law.

Given Plaintiffs' failure to show irreparable harm or the lack of an adequate remedy at law, the Court will not proceed further to balance the harms faced by each party if relief is granted. *See Jones*, 842 F.3d at 1058. Plaintiffs' motion will be denied.

**III.  Defendants' Request for Attorney's Fees and Costs is Denied.**

While the Court agrees with HellermannTyton and Marsden that Plaintiffs have come up short in supporting their request for injunctive relief, the Court disagrees that either defendant is entitled to attorneys' fees and costs. A prevailing defendant may recover reasonable attorney's fees and costs incurred defending against a trade secrets misappropriation claim brought in bad

faith. Wis. Stat. §134.90(4)(c); 12 Pa. Cons. Stat. §5305(1); 18 U.S.C. § 1836(b)(3)(D). Bad faith claims include frivolous claims and claims brought or maintained for an improper purpose, like harassing a defendant, or needlessly increasing the cost of litigation. *Tradesman Int'l, Inc. v. Black*, 724 F.3d 1004, 1016 (7th Cir. 2013); *LQD Bus. Fin., LLC v. AKF, Inc.*, 2025 WL 830444 at *5 (7th Cir. Mar. 17, 2025.)

Plaintiffs' pursuit of injunctive relief in this case does not rise to the level of bad faith. It is clear that Marsden violated Heyco policy and likely breached the terms of his Confidentiality Agreement. The circumstances in which Penn Engineering and Heyco discovered his violations understandably caused them serious concern. In the days and weeks before he left Heyco's employment for a competitor, Marsden accessed and forwarded Heyco information to his personal email. It was entirely reasonable for Penn Engineering and Heyco to pursue their claims and to try to obtain injunctive relief to protect their business. In the end, however, they have come up short in marshaling sufficient evidence to obtain preliminary equitable relief. But the failure to prevail on one's claims is not bad faith. This case is far different than *Sanimax LLC v. Blue Honey Bio-Fuels, Inc.*, 2019-AP-166, 2020 WL 2529225 at *3, (Wis. Ct. App. May 19, 2020), which Defendants cite. That case affirmed an attorney's fees award under WUTSA where a plaintiff proceeded to trial (and appeal) despite having no evidence that its former employee actually *took* a customer list. *Id.* at *3. As explained above, Penn Engineering and Heyco had a reasonable basis to pursue their claims in this case. And, at this point, Plaintiffs have only unsuccessfully moved for a preliminary injunction. There is nothing at this point that suggests they have maintained a suit in bad faith.

## CONCLUSION

Because Plaintiffs have not shown that they risk irreparable harm absent injunctive relief, the Court will deny Plaintiffs' motion for a preliminary injunction.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Entry of Temporary Restraining Order and Preliminary Injunctive Relief, ECF No. 5, is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' request for attorney's fees, ECF No. 62, is **DENIED**.

**IT IS FURTHER ORDERED** that the parties shall file a joint status report by **January 16, 2026**, describing how they wish to proceed.

Dated at Milwaukee, Wisconsin, on December 9, 2025.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge